**MID–WEST OIL CORPORATION,**
**Appellant,**

v.

**John J. EISNER, Appellee.**

No. 3570.

Court of Civil Appeals of Texas.

Eastland.

Nov. 11, 1960.

Rehearing Denied Dec. 6, 1960.

Stubbeman, McRae, Sealy & Laughlin, Midland, for appellant.

Rutledge & Rutledge, Abilene, for appellee.

GRISSOM, Chief Justice.

John J. Eisner sued Mid-West Oil Corporation in Taylor County for a debt alleged to be due under a dry hole contribution contract for drilling a well in Garza County. The defendant filed a plea of privilege to be sued in Midland County. It was overruled and defendant has appealed.

The contract for drilling the well provided that Eisner should commence drilling a well in Garza County on or before June 15, 1959, and drill it with diligence to a depth of 8,400 feet, unless at a lesser depth the Ellenburger formation had been tested to the satisfaction of Mid-West. It provided that when the well was drilled Eisner should run an electrical survey and "if the well has been drilled in accordance with the terms of the preceding paragraph and completed, plugged and abandoned as a dry hole, we shall, after receiving satisfactory evidence from you of such plugging and abandonment * * *" Eisner $1.00 per foot. It further provided that when Eisner encountered "shows" of oil or gas he should immediately notify Mid-West, so that its agent could witness the testing, and "You (Eisner) agree to test satisfactorily and any and all formations in which you encounter shows of oil and/or gas and immediately notify Midwest * * * as to the results of such tests." There was no dispute prior to the trial of the plea of privilege about the fact that Eisner timely commenced drilling the well and drilled it with diligence until it reached 8,210 feet and that the well was drilled in compliance with the terms of the contract, unless Eisner had a duty to test two certain intervals. However, Mid-West now contends the well was not a "dry hole".

The well was swabbed on August 20th and produced 5 barrels of oil per hour, with a trace of water. The same thing was done on the 21st with the same result. From August 22nd through September 4th pumping equipment was obtained, installed, the packer was pulled loose and the load water was pumped, with a trace of "new" oil. On September 5th the well pumped 52 barrels of new oil and a trace of water. It pumped slightly more each day until September 9th, when it pumped 47 barrels of new oil with a trace of water. On September 10th it pumped 22 barrels of new oil and a trace of water. On September 11th the rods were pulled to check the bottom hole pump. On September 12th it pumped 35 barrels of new oil and a trace of water; September 13th, 27 barrels; September 14th, 20 barrels; September 15th, 12 barrels. September 16th through September 20th the tubing was pulled, the well acidized and acid water and load oil pumped out. On September 21st, 12 barrels of new oil were produced; September 22nd it produced 55 barrels; September 23rd, 44 barrels; September 24th, 57 barrels; September 25th, 57 barrels; September 26th, 55 barrels; September 27th, 49 barrels; September 28th, 52 barrels and September 29th, 45 barrels. As we understand the evidence, at the time the well was abandoned and plugged it was producing 12 barrels of oil and 7 barrels of water per day. There was produced a total of about 800 barrels of oil from around 7,544 feet.

On October the 3rd Eisner notified Mid-West that he intended to abandon and plug said well "to which test your company has agreed * * * to contribute dry hole money in the amount of $8,210.00." By telegram dated October 8th, Mid-West acknowledged receipt of said notice. It then informed Eisner that it did not consider the well adequately tested and that *"In order to earn the contribution we will require you to test the Strawn intervals 7713–7723 and 7815–7820."* (Emphasis by the Court.) In other words, before the well was plugged Eisner was advised by Mid-West that the dry hole money had not been earned for the sole reason that Eisner had not adequately tested two certain intervals and that to "earn the contribution" it required a test of said two intervals. Said tests were not made. Whether Mid-West

had the right to demand said tests is the real issue. However, assuming that whether the well was a dry hole was an issue, the court could have found that such defense was waived. The testimony of Mr. Eisner's representative in charge of the drilling as to "shows" of oil or gas at 7,713 to 7,723 feet is as follows:

"Q. How about the interval 7,713 to 23? A. Yes sir.

"Q. You do show a show there? A. I show no florescence or cut, but I do show a slight trace—I do have a slight gas reading at that point."

Mid-West's representative testified relative to a "show" of oil or gas at interval 7,713 to 7,723 as follows:

"Q. Would you look at the interval 7713 to 23? A. Yes.

"Q. Does your log indicate a show of oil and gas at that interval? A. It shows visual porosity, visual staining and I have no indication of gas.

"Q. Do you have an electric log there made of this well? A. Yes.

"Q. Does it indicate a show of oil or gas at that depth? A. Yes, it does."

There was no other testimony relative to a "show" at said interval. There was no evidence of a "show" between 7,815 and 7,820 feet. Under the contract Eisner had the duty to test all formations in which he encountered a "show" of oil or gas. The evidence raised a question of fact as to whether there was a "show" of oil or gas between 7,713 and 7,723 feet. We think the court could have concluded, and presumably did conclude, there was no "show" of oil or gas between 7,713 and 7,723 feet. It was not established that there was a "show" at the other interval that Mid-West demanded be tested as a prerequisite to payment of the agreed contribution. Therefore, despite Mid-West's demand, Eisner had no duty to make such tests. Mid-West did not refuse to pay on the ground that the well was not a dry hole

within the provision of the contract relative thereto. It said to Eisner, in effect, that all you have yet to do to earn the contribution is to make two tests in the Strawn formation. Mid-West's representative testified that salt water condemned the Ellenburger section of the well and that the Ellenburger formation had been satisfactorily tested.

▮ Appellant's contention on appeal is that the court improperly overruled Mid-West's plea of privilege because the evidence shows said well was not a "dry hole". The pleadings fix no definite issue. Eisner's controverting affidavit asserts the right to maintain suit in Taylor County under exception 27 to Article 1995, which provides, insofar as it is here material, that a foreign corporation with a permit to do business in Texas may be sued in the county where the cause of action or a part thereof arose. Eisner had the burden of alleging and proving a cause of action against Mid-West and that a part thereof arose in Taylor County. General Motors Corporation v. Ewing, Tex.Civ.App., 300 S.W.2d 714; Darnell v. Southwestern American Insurance Co., Tex.Civ.App., 226 S.W.2d 239, 241; Southern Farm Bureau Casualty Ins. Co. v. Alexander, Tex.Civ.App., 326 S.W.2d 644; Aetna Life Insurance Co. v. McIver, Tex.Civ.App., 65 S.W.2d 817; Fox v. Grand Union Tea Co., 236 S.W.2d 561; Groendyke Transport Co. v. Freeman, Tex. Civ.App., 255 S.W.2d 393. When Eisner notified Mid-West that he was about to plug and abandon the well and expected payment according to the contract, Mid-West did not object to the abandonment on the ground that it was not a "dry hole". It simply replied that it required the testing of two intervals as a prerequisite to payment. The only reason given for Mid-West's refusal to pay Eisner for drilling the well at the time it was plugged was that he failed to test two intervals, one of which under all the evidence had no "show" of oil or gas. Whether there was a "show" between 7,713 and 7,723 feet was a question of fact, which the court had the right to, and presumably did, find in favor of

Eisner. We think the court had the right to conclude that Eisner alleged and proved a cause of action against Mid-West and that a part thereof arose in Taylor County. He alleged and introduced evidence sufficient to support a finding that the contract, which was the basis of the cause of action, was executed in Taylor County; that it was performed by him and Mid-West refused to pay. Proof of execution of the contract in Taylor County supported the conclusion that a part of the cause of action arose there. El Laredo, Inc. v. Orr, Tex.Civ. App., 321 S.W.2d 624.

The judgment is affirmed.